UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

LANCE BLACK,

Plaintiff,

v.

CITY OF SAN DIEGO, et al. ,

Defendants.

Case No.: 3:21-cv-01990-RBM-JLB

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

[Docs. 205, 206, 207, 208, 209, 210, 211, 212, 214, 215, 218]

There are currently eleven motions for summary judgment pending before the Court. Defendant police officers Ryan Poole, Christina Berg, Austin Fowler, Jardin Killinger, Elizabeth Ortiz, Kyle Valente, Jonathan Wells, Alyssa Tutterow, and Amy Buell have all filed motions for summary judgment on all claims asserted against them in this case. (Docs. 205, 206, 208, 209, 210, 211, 212, 215, and 218.) Defendant City of San Diego has filed a motion for summary judgment. (Doc. 207.) Plaintiff Lance Black has filed a motion for summary judgment on his state law claims for false imprisonment and under the Bane Act against Poole. (Doc. 214.) Oppositions to all motion have been filed (Docs. 224, 228,

229, 230, 231, 232, 233, 234, 235, 236, 252[1]) and all parties have filed reply briefs (Docs. 237, 238, 239, 240, 241, 242, 244, 245, 246, 247, 254). Additionally, the parties filed a very late Joint Statement of Undisputed and Disputed Facts. (Doc. 270.)

The Court finds the matter suitable for determination on the papers and without oral argument pursuant to Civil Local Rule 7.1(d)(1). For the reasons outlined below, Defendants' Motions for Summary Judgment are **GRANTED in part** and **DENIED in part** as detailed below. Plaintiff's Partial Motion for Summary Judgment is **DENIED**.

## I. BACKGROUND

The facts summarized here are drawn primarily from the body worn camera ("BWC") videos the parties rely on and lodged with the Court in support of their respective motions for summary judgment.[2] The Court also includes some undisputed facts from the Joint Statement of Undisputed and Disputed Facts the parties eventually filed (Doc. 270)[3]. The facts that are disputed or warrant further discussion relative to the parties' briefing are discussed in analyzing the claims.

"Plaintiff Lance Black is a Black man." (U_1.U1.) "On November 3, 2020, at approximately 8:00 p.m., Plaintiff … was driving eastbound on El Cajon Boulevard in San Diego in a gray 2017 Infiniti QX80." (U_2.U3.) Officers "Ryan Poole and Elizabeth Ortiz were San Diego Police Officers … on duty [and] driving a SDPD marked vehicle" when they pulled over Plaintiff. (U_19.U11.) "At the time of the incident, … Poole was a trainee

---

[1] Plaintiff initially failed to file an opposition to Ortiz's Motion for Summary Judgment but was permitted to file it late. (Doc. 43 (initial reply brief noting lack of opposition).) The Court permitted Plaintiff to file a late opposition (Doc. 252) and Ortiz filed a new reply brief (Doc. 254).

[2] As explained in analyzing the claims, where the record is clear on one or more videos of the events such that there can be no genuine dispute about what happened, the Court views "the facts in the light depicted by the videotape." *Handy v. Jones*, — F.4th —, 2026 WL 2716416, at *5 (9th Cir. 2026) (applying and quoting *Scott*, 550 U.S. 372, 378–81 (2007)).

[3] The Court cites to the Joint Statement using the parties' numbering without including citation to the underlying evidence they cite in the Joint Statement.

assigned to … Ortiz as his field training officer." (U_22.U13.) Plaintiff's "license plate displayed registration stickers indicating expiration in August 2020" (U_4.U5) and "the dispatcher reported that the vehicle registration was expired." (U_25.U18.) "Neither Poole nor Ortiz "observed or identified Plaintiff's race before initiating the traffic stop." (U_28.U24.) "Poole had already activated his emergency lights and initiated the traffic stop before dispatch reported that the vehicle registration was expired." (U_33.U23.) Although the majority of the events that Plaintiff claims are based on occurred fairly quickly over approximately fifteen minutes, this decision summarizes the conduct in five parts for purposes of referencing the relevant portions of the officers' BWC videos: (1) officers' initial interaction with Plaintiff when he is pulled over; (2) Plaintiff's exit from the car; (3) Plaintiff being handcuffed; and (4) Plaintiff's interaction with officers after being handcuffed.

**A. Officers' Initial Interactions with Plaintiff at the Car**

The following occurred on video over the course of approximately four minutes on the BWC videos of numerous officers. (Poole_1 at 2:40–6:40; Ortiz_1 at 2:35–6:40; Valente_1 at 2:00–2:40; Wells_3 at 2:00–2:40; Killinger_1 at 2:05–3:11; Fowler at 2:10–3:20; Tutterow at 2:15–4:30; Burns at 2:29–3:05; Rodriguez 2:20–2:50.)[4] Plaintiff is in the driver's seat of the car with the window rolled down. Plaintiff's left arm is at or partially out of the window during part of this initial interaction. He is holding his phone in his right hand initially but shifts it to his left later during the interaction with Ortiz and

---

[4] Most of the events that occurred between Plaintiff and San Diego police officers on November 3, 2020 were captured on one or more officers' BWCs. (*See* U_11.U172 (acknowledging footage exists from multiple officers involved in the incident).) While there are moments that are not entirely clear because the view is obstructed by a person, the camera is so close to another person that nothing is visible, or a camera is knocked to the ground, the majority of interactions are captured on BWCs. There are portions at the beginning of most of the videos that lack audio when officers are in their cars as well as one period, what appears to be a discussion among officers following Plaintiff being handcuffed and placed in a police car.

Poole. As Ortiz and Poole approach the car, Poole is in front of Ortiz and first speaks with Plaintiff at the window, but they switch locations when Ortiz steps up to talk to Plaintiff. Throughout their exchange, Plaintiff is speaking loudly and quickly.[5] Poole and Ortiz are not, although their statements are easily heard on camera.

Poole says "hey sir, how ya doing" to which Plaintiff says "you need to explain to me why the hell you stopped me when my registration is good, my insurance is good, you had no reason to stop me, why did you stop me?" As Poole says, "let me explain" Plaintiff interrupts and says "first off what's your name and why did you stop me?" As Poole starts again to answer, saying "okay, I stopped you because" and points toward the back of the car, Plaintiff interrupts again and says "don't tell no damn lie, I didn't run any lights" and asks again why did he stop him. Poole says he stopped him because his "registration is not okay" and when Plaintiff disputes this and says his registration is valid, Poole says they "ran it on the computer and it is expired." Plaintiff disputes this information, telling Poole that he bought his car in September of this year. Poole says okay and then Plaintiff says "nothing in there showing my registration is invalid, my insurance is valid, everything on my car is valid. What you thought was you were stopping a nigger in the car with a good car, get the fuck away from my car and call your supervisor, call your supervisor, shut up talking to me, call your supervisor." Plaintiff repeats to Poole to "shut up talking to me," that he does not want to talk to him, and to "call your supervisor." Poole only says "sir" a

---

[5] The Court includes some, but not all, of Plaintiff's statements to officers not to suggest that Plaintiff was not permitted to speak loudly, to curse, or to accuse officers of racial profiling using racial slurs. *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1019 (9th Cir. 2015) ("'Ninth Circuit law ... clearly establishes the right verbally to challenge the police,' and 'verbal protests cannot support an arrest under § 148.'") (quoting *Mackinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir. 1995) (collecting cases) "Likewise, 'California law ... gives citizens considerable latitude in confronting the police.'" *Id.* (quoting *Mackinney*, 69 F.3d at 1007.

few times as Plaintiff is repeating not to talk to him and to call a supervisor. Ortiz can be heard requesting a Sergeant to their location.

Ortiz steps forward by the window, with Poole stepping back as Plaintiff is repeating to call a supervisor, Ortiz tells Plaintiff she is Poole's supervisor. Plaintiff then says to call the watch commander. Ortiz also attempts to talk to Plaintiff, tells him there is a Sergeant en route, and tells him he needs to calm down. He continues to say repeatedly and loudly, "shut up talking to me," repeats that he does not want to talk to her, and tells her to "call [her] Sergeant." As she is saying okay, he repeatedly tells her to get away from his car to which she responds "I'm not going to do that." He then says he is turning off his car, and that he is not going anywhere. Plaintiff states his name and his driver's license number fast and Ortiz asks him if he has his driver's license on him two times as he is saying "get the fuck away from my car, shut up talking to me, get away from my car, I'm not getting shit out." Plaintiff then states that if they ran his car with the DMV it would show his car is registered, but Plaintiff does not provide and the officers do not specifically ask for Plaintiff's registration. At this point Ortiz requests another unit and a Sergeant to their location. Plaintiff then addresses an officer on the other side of the car, Tutterow, who shined her flashlight in the car. "Tutterow was the first cover officer to arrive at the scene." (U_88.U40.)

Ortiz asks Plaintiff a third time "do you have your driver's license on you sir" and Plaintiff says no because the DMV is closed. Plaintiff then repeats his driver's license number and name and she says they will look it up. Additional officers can be heard arriving with sirens. The parties agree that at some point "[a] Code 3 Request was issued by someone in the San Diego Police Department" and that request "prompted numerous police vehicles to race to the location with sirens blaring and lights flashing. (U_55.U47; U_56.U48.) Ortiz asked Plaintiff why he is driving without a license and he says he is still waiting for an appointment. Ortiz then asks him if he has his expired license and he says he does not because his license was stolen. She asks him why he is so upset and he says because they had no business stopping him and that if he was driving up near his job in

Sorrento Valley or La Jolla he would not get stopped, but "we drive through here and you see us driving in the car and you have a reason to stop us." Ortiz then repeats that his registration is expired. He points out he just bought the car. She says again that his registration is expired. She then tells Plaintiff that her partner is going to try to identify him and Plaintiff goes back to repeating that he does not want to talk to them, to get away from him, and not to touch the car. "Fowler and Killinger [have] arrived at the scene [and] [t]hey [are] unaware of why Plaintiff ha[s] been stopped." (U_57.U49.)

At this point, Killinger is standing behind Poole and Oritz near the back of the car on the driver's side. Fowler is behind Killinger and is standing just behind the car. Ortiz then asks Killinger, "you wanna watch him for us," and Killinger steps over to the car. Ortiz and Poole go back to their car and start to try to identify Plaintiff using the computer in the car.

While this exchange is going on between Plaintiff and Ortiz on the driver's side of the car, Tutterow arrives and goes to the passenger side of the car. She shines a flashlight in the car just after Plaintiff states "I'm not getting shit out." Plaintiff says "what the fuck you doing shining your light in my car" to her. While Plaintiff's discussion with Ortiz is ongoing, additional officers can be heard arriving with sirens on. Tutterow then briefly shines her flashlight into the car again. As an additional officer comes to the passenger side, Tutterow says, "you can go to that side, he's just uncooperative and yelling" and when asked "just one?" she says "yeah." Tutterow shines her flashlight in the car again briefly. Wells, who had arrived saying "Yank him out of the car" comes up on the passenger side and shines his flashlight in through the front window on the passenger side. When additional officers come to the passenger side and look into the front seat area using flashlights, Tutterow says "he's just yelling" and "he's the only one." Two officers position themselves near the front passenger side of the car with their flashlights in the front passenger area and a third officer is near the back seat passenger side window.

///

///

**B. Plaintiff's Removal From the Car**

The following occurred on video over the next minute on the BWC videos of numerous officers. (Jennings at 2:05–2:50; Fowler at 3:30–4:00; Killinger_1 at 3:10–4:00; Poole_1 at 6:40–7:15; Ortiz_1 at 6:55–7:20; Valente_1 at 2:30–3:20; Wells_3 at 2:30–3:20; Fowler at 3:20–4:10; Tutterow at 4:30–5:20; Buell 2:10–2:50; Burns at 3:05–3:30; Rodriguez 2:50–3:30.)

Killinger is positioned just behind Plaintiff's door with his hand on the top of the car near the driver's window. As Killinger and Plaintiff engage in the exchange below, Plaintiff is shifting his phone from one hand to the other and his hands are moving down into the car and then back into view through the window. As Killinger steps up by the window and Ortiz and Poole walk away, Plaintiff comments "stupid ass crackers do this shit, you think all of us going to lay down on some dumb ass shit" and repeats "get your fucking hand off my car" to which Killinger responds "no." As Killinger says "you're being detained right now," Plaintiff shifts as if he is going to open the door and Killinger says "you want to come out and talk to me" and Plaintiff says "yeah, I'll come out." Killinger then says "come out and talk to me" and Plaintiff opens the door. Plaintiff has his phone in his right hand but shifts it to his left as he opens the door, he turns as if he is going to get out, but he does not get out.

Plaintiff is facing out of the car with one leg partially out but remains in the car as Killinger says again "come out and talk to me" as he reaches toward Plaintiff's hands. Plaintiff grabs Killinger's left wrist, pushes it away, and tells him "get your hand off me" twice. Killinger does not reach for him again at this point but tells Plaintiff to take his seatbelt off. The door remains open. Killinger and another officer collectively tell Plaintiff at least three times to take his seatbelt off. Plaintiff shifts so that he is sitting facing forward but slightly towards the open door and scrolls and taps on his cell phone. Wells, who had come around to the driver side when Plaintiff opened the door says "we're already here, take him out." Plaintiff's right hand goes back toward the seatbelt release but does not release his seatbelt. Another officer, Buell, appears on the other side of the car and opens

the passenger door. Buell had just arrived and walked around to the passenger side. When she opens the passenger side door, Plaintiff asks why she is opening his door and she also tells Plaintiff "Sir, take your seatbelt off" and Plaintiff responds "or what?" As Plaintiff turns his head to address Buell, Killinger reaches in and unbuckles Plaintiff's seatbelt. Wells, positioned by the driver side door is saying "get out of the car, get out of the car now" as Killinger releases the seatbelt. As Killinger reaches for the seatbelt release, Plaintiff's phone falls from Plaintiff's hand. Killinger appears to bump it reaching for the seatbelt release, but very clearly did not grab the phone. The phone appears to fall into the driver-side floorboard. Plaintiff is pulled by his hands/wrists from his seated position in the car to standing outside the car. The officers around Plaintiff as he is standing outside the car shift and appear to brace themselves in a way that would suggest Plaintiff was moving against them in some manner, but it is difficult to decipher from the videos alone if Plaintiff "shoulder checked" Killinger. Killinger's camera is knocked to the ground.

There are other officers away from, as well as around, the car as Plaintiff is opening the car door. All the officers appear to react in some way to the door opening which prompts Poole and Ortiz to move quickly from their car, where they had gone to try to identify Plaintiff on the computer, back to Plaintiff's car with Poole arriving on the driver's side of the car as Killinger is telling Plaintiff to take his seatbelt off multiple times. Valente, who had been on the passenger side between Tutterow and the passenger window comes around to the front of the car. Valente is initially standing behind another officer as Killinger is telling Plaintiff to take his seatbelt off multiple times. Valente is standing on the driver side near the front facing the driver-side door while Plaintiff is sitting in the driver's seat with his seatbelt still on and Killinger tells Plaintiff to get out of the car. As Poole comes around the back of the car, Plaintiff is out of the car, standing up, facing towards the back of the car, and there is a shift into Killinger with Killinger appearing be pushed into or falling against the car, but again, it is unclear from the video how he was contacted. Killinger then steps back. Tutterow, who had been at the passenger side door, goes around toward the back of the car when Plaintiff opens the door, turns back towards

the passenger side and follows Buell as she goes around and opens the passenger door and tells Plaintiff to take off his seatbelt.

**C. Handcuffing Plaintiff**

The following occurred on video over the course of the next two minutes on the BWC videos of numerous officers. (Ortiz_1 at 7:20–9:00; Poole_1 at 8:15–9:00; Jennings at 2:45–4:35; Fowler at 4:00–5:50; Killinger_1 at 3:50–5:50; Poole_1 at 8:15–9:10; Ortiz_1 at 7:15–9:00; Valente_1 at 3:20–5:00; Wells_3 at 3:20–5:15; Fowler at 4:00–5:55; Tutterow at 5:20–7:10; Buell 2:50–4:35; Burns at 3:30–5:25; Rodriguez 3:30–5:25.)

After the officers around Plaintiff seem to shift, Plaintiff is standing facing the car. Plaintiff is stating repeatedly "You can't stop me from recording" and then switches to "I didn't violate no fuckin' law." Plaintiff's arms are in front of him and an officer can be heard telling Plaintiff repeatedly to "just relax" and to breath. Plaintiff says "why are you grabbing on me" and an officer responds "because you're pulling your arms forward." Plaintiff says "you stopped me for a bullshit ass reason because you saw a black man driving a nice car." An officer then says "tell him if he doesn't cuff up we're gonna put him on the ground," and another officer says "if you don't relax, we're gonna" and Plaintiff says "what you gonna put me on the ground for" and an officer says "what I just said." Another officer says "if you don't relax [inaudible]." An officer then says "put your hands behind your back" three times with Plaintiff saying in between each time "what law did I violate" before Plaintiff is taken to the ground. "Plaintiff landed on top of Valente." (U_167.C160.)

A number of officers have their hands on or near Plaintiff's back as the handcuffs are put on, and his arms are being held in a way that keeps his hands behind his back, but there are no officers on his back. The officer that is putting the handcuffs on Plaintiff, appears to be Wells, is over Plaintiff's left leg and Buell appears to be over Plaintiff's right leg although it is unclear from the video if they are or are not putting weight on his legs. When an officer confirms the handcuffs are on, most of the officers stand up. There are officers still down by him, but only with a hand on him as Plaintiff is shifted to his side

and two officers check his pockets. From the time officers put him on the ground to Plaintiff being in handcuffs is approximately 20 seconds. Officers have checked his pockets and have him up on his feet in an another approximately 20 seconds.

While officers are attempting to handcuff Plaintiff, Poole is standing behind the officers with Buell and Ortiz. Ortiz tells Poole to back up a little and then before Plaintiff is put on the ground, Ortiz tells Poole to "go back, there are plenty officers up here, go back and see if you can identify him." Ortiz returns to the car with Poole and Poole says he does not think Plaintiff gave him enough numbers. Oritz asks if Poole wrote down the name he gave. Ortiz then sees the officers putting Plaintiff on the ground and says "Jeez, stop traffic." Ortiz and Poole then move a police car to block a lane and Ortiz and Tutterow direct traffic. By the time the police car is moved, Plaintiff is standing up in handcuffs and being walked to Ortiz and Poole's car. Tutterow directs traffic and walks back and opens the door for officers putting Plaintiff into the back seat of Poole and Ortiz's car. Tutterow did not at any point have any contact with Plaintiff other than shining her flashlight in the car from the passenger side window, including not restraining him, having any physical contact with him, not arresting him, not drawing a weapon against him and not transporting him. (U_93.U61; U_94.U63; U_95.U64; U_96.U65.) Buell, who had picked up two BWCs that fell to the ground and was asking other officers if they were their BWCs, returns to trying to give the BWCs to the correct officers after Plaintiff is in handcuffs, and then she walks over near the car Plaintiff is being put in.

**D. After Plaintiff is Handcuffed**

The remainder of the time Plaintiff was in handcuffs at the location of the incident was approximately ten minutes. (Ortiz_1 at 9:00–19:45; Ortiz_2 at 0:00–19:00; Poole_1 at 9:00–20:02; Poole _2 at 0:00–17:21; Valente_2 at 0:00–18:00; Rodriguez 5:25–6:45; Cummings at 3:10–4:35; Buell at 4:35–5:55; Wells_1 at 0:00–17:50; Killinger_1 at 6:00–8:00.)

Officers walk Plaintiff over to Ortiz and Poole's car and put him in the backseat. As Ortiz is returning from directing traffic, she encounters Sergeant Berg who has just arrived.

When asked what happened, Sergeant Berg explains that they stopped him for expired registration, he was yelling as soon as they walked up, was screaming the entire time, they had Killinger and Fowler watching him, walked back to run him, and they pulled him out of the car and he started fighting with them. By the time Ortiz returns to the car, Plaintiff is already in the back seat and Poole is attempting to identify Plaintiff on the computer.

When Ortiz asks Poole if he has identified Plaintiff yet, Plaintiff states from the backseat that he has his ID in his pocket. Ortiz steps out of the car to speak with Sergeant Berg who is confirming with Ortiz what happened and Sergeant Berg says, "so basically, you guys pulled him over for the expired reg and he was getting lippy?" Ortiz responds "yeah, he was just super agitated with us." Ortiz returns to the car with Poole and assists him in trying to identify Plaintiff. Berg returns to the car a few minutes later and tells Ortiz that they "are going to go with 69 for him body checking Killinger." Berg tells them that they, Ortiz and Poole, are going to be the case agents because they were not involved and handled the initial stop. Sergeant Berg then says she is going to call the Lieutenant too. Ortiz then tells Poole this, pointing at the computer, can wait now and they get out of the car. When Poole comes around to the sidewalk Ortiz says, "are you on? go off" and then Poole's camera turns off.

A number of officers that are still present are in a discussion. The discussion is visible on video, but the audio is not on for the officers' BWCs and does not come back on until they walk back to the car to get Plaintiff out. Poole tells Plaintiff that he is under arrest. Plaintiff asks for what and Poole says assault on a peace officer. Plaintiff is taken out of the car.

While he is standing in front of the car having his pockets emptied, he begins talking to Sergeant Berg and indicates for the first time that he has documentation in the car related to his registration. He denies to her having done anything, says that Killinger took his phone, stopped the recording, and threw it on the ground and tells Sergeant Berg she should be investigating what happened because the officers are lying. Wells points out the handcuffs are not double locked to Oritz and she tells Poole to make sure to double lock

the handcuffs and check for proper tightness. When Poole adjusts them, Plaintiff complains that Poole is squeezing the handcuffs and it is impacting his circulation. Poole is checking them and says "they can't be too loose" but continues to adjust them. Plaintiff says they are pressing up against the bone in his hand and Poole responds "they aren't meant to be comfortable" but continues to try and adjust them. Sergeant Berg comes over and adjusts them, indicating after she adjusted them that she loosened the left that was too tight and the right is tight but okay. Wells then says they are his and asks if Sergeant Berg wants him to check them out. Wells then attempts to adjust them with his key. While the handcuffs are being adjusted, Plaintiff comments to Fowler and says "you're sitting here watching what's going on when you know I didn't violate any law" and he comments back about Plaintiff's attitude. Wells continues to adjust the handcuffs. Berg explains to Wells that they are a little tight but they are okay but Wells continues to try to adjust them. Wells is visibly trying to adjust the right one and Ortiz and Wells both say "there you go" and they stop adjusting them. The three officers collectively spend approximately seven minutes attempting to adjust the handcuffs before Plaintiff is taken back to the car. He says when he is getting in the car that they are still too tight.

Valente locates Plaintiff's phone under the driver's seat of Plaintiff's car during the officers' inventory search of the car. He confirms it is Plaintiff's with Plaintiff and gives it to Sergeant Berg. Officers conduct the search of Plaintiff's car on their BWCs. Poole goes back to Plaintiff's car, looks in the front middle console, asks if they found anything, and the officer says they found his phone. Once Plaintiff is in the car, an officer comes and confirms with Plaintiff that the phone he has is Plaintiff's, gives it to Sergeant Berg, and she puts it on the car hood with the items from Plaintiff's pockets. "Officers searched Plaintiff's vehicle, including the interior, glove box, center console, trunk, and engine compartment." (U_245.U152.) Poole returns to the police car and puts Plaintiff things that were taken out of his pockets into a bag that is then put in the back of the car. Plaintiff is returned to the car.

///

"After arrest, Plaintiff was taken to the Mid-City Division of the San Diego Police Department and remained handcuffed in the back of a patrol vehicle for approximately two hours before being transported to county jail." (U_247.U206.) "Poole and Ortiz transported Plaintiff to jail." (U_209.U159.) During a portion of the time Plaintiff is being transported, Ortiz can be heard saying "as long as there's nothing that you found you can 1022 it, that's fine." Plaintiff was booked for violating Penal Code §§ 148(a)(1) and 243(c)(1). (U_225.U160.)

## II. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. (citation omitted). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To carry its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Jones v. Williams*, 791 F.3d 1023, 1030–31 (9th Cir. 2015) (quoting *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000)).

Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Serv.*,

809 F.2d at 630 (citations omitted). The nonmoving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citation omitted). The non-moving party must show more than a scintilla of evidence. *Anderson,* 477 U.S. at 252; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden … its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). The non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor. *Anderson,* 477 U.S. at 252.

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1). When ruling on a summary judgment motion, the court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, courts "do not credit a party's version of events that the record, such as an unchallenged video recording of the incident, 'quite clearly contradicts.'" *Rice v. Morehouse*, 989 F.3d 1112, 1120 (9th Cir. 2021) (quoting *Scott v. Cnty. of San Bernardino*, 903 F.3d 943, 952 (9th Cir. 2018)).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "[I]t is not the district court['s] [task] to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). Rather, the Court relies "on the nonmoving party to identify the evidence that precludes summary judgment." *Id.* (quoting *Richards*, 55 F.3d at 251) (citation modified).

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is

ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255.

**B. Plaintiff's Claims under 28 U.S.C. § 1983**

A claim under § 1983, has "two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1144 (9th Cir. 2021) (citing *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006)). Section 1983 is not itself a source of substantive rights but merely provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). Plaintiff asserts the following claims under § 1983: (1) False Arrest; (2) Excessive Force; (3) Unlawful Search; and (4) First Amendment Retaliation.

**1. Qualified Immunity**

"Government officials enjoy qualified immunity from suit under § 1983 unless their conduct violates clearly established law." *Zorn v. Linton*, 607 U.S. 568, 571–72 (2026) (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5, (2021) (per curiam)). Qualified immunity is "an immunity from suit" that "is effectively lost if a case is erroneously permitted to go to trial." *White v. Pauly*, 580 U.S. 73, 79 (2017) (Supreme Court explaining necessity of repeatedly "reversing federal courts in qualified immunity cases … because qualified immunity is important to 'society as a whole,' and because as 'an immunity from suit,' qualified immunity 'is effectively lost if a case is erroneously permitted to go to trial.'") (quoting *Pearson*, 555 U.S. at 231). Qualified "immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." [T]o overcome qualified immunity, [Plaintiff] must show that [Defendants] (1) 'violated a federal statutory or constitutional right' and (2) 'the unlawfulness of their conduct was clearly established at the time.'" *Ballentine v. Tucker*,

28 F.4th 54, 61, (9th Cir. 2022) (quoting *District of Columbia v. Wesby*, U.S. 48, 62–63 (2018)). "The two elements do not need to be analyzed in any specific order, and courts are permitted to 'exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first ....'" *Id.* at 63 (quoting *Pearson*, 555 U.S. at 236). "[T]he application of the qualified immunity doctrine varies with the nature of the right." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 n.1 (9th Cir. 2011). "Some constitutional rights are stated in relatively specific rules" but others "like the Fourth Amendment's prohibition against unreasonable searches and seizures, are not." *Id.*

When evaluating qualified immunity at the summary judgment stage, the first prong of the analysis asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right." *Tolan*, 572 U.S. at 655–56 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second step of the qualified immunity analysis "ask[s] whether the right was clearly established in light of the specific context of the case." *Scott*, 550 U.S. at 377 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 236). At summary judgment, this means the specific context of the case is determined by viewing the evidence in the light most favorable to and drawing all inferences in favor of the party asserting the injury. *Tolan*, 572 U.S. at 656–57 ("[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.") "To find that a right is clearly established, courts generally 'need to identify a case where an officer acting under similar circumstances ... was held to have violated' the Constitution." *Zorn*, 607 U.S. at 572 (quoting *Escondido v. Emmons*, 586 U.S. 38, 43 (2019) (per curiam)). "The relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Id.* (quoting *Wesby*, 583 U.S. at 63). "In short, officers receive qualified immunity unless they could have 'read' the relevant precedent beforehand and 'known' that it proscribed their specific conduct." *Id.* (quoting *City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 616, (2015)); *see also Reichle v. Howards*, 566 U.S.

658, 664 (2012) ("In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'") (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

There is no dispute that the officer Defendants were acting under color of State law, the only issues the Court must consider on Plaintiff's § 1983 claims is if, viewing the evidence in the light most favorable to and drawing all reasonable inferences in favor of Plaintiff, the individual Defendants are entitled to qualified immunity.

**a) False Arrest (Fourth Amendment)**

"It is well established that 'an arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983.'" *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (quoting *Borunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir. 1988)); *see also Barry v. Fowler*, 902 F.2d 770, 772 (9th Cir. 1990) (The "constitutionality of a warrantless arrest is determined by the existence of probable cause.").

"In the context of an unlawful arrest, then, the two prongs of the qualified immunity analysis can be summarized as: (1) whether there was probable cause for the arrest; and (2) whether it is reasonably arguable that there was probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Rosenbaum*, 663 F.3d at 1076 (citing *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007)).

Plaintiff asserts a Fourth Amendment false arrest claim under § 1983 against Poole, Ortiz, Fowler, Valente, Killinger, Wells, Berg, Buell, and Tutterow. The Court finds that the officers are entitled to qualified immunity on Plaintiff's false arrest claim because they had probable cause to arrest Plaintiff. Additionally, under the second prong, even if they were mistaken about having probable cause, they were reasonably mistaken with no clearly established law giving them notice they would lack probable cause under the circumstances.

///

**(1) Probable Cause for Arrest**

"Probable cause to arrest exists when there is a 'fair probability or substantial chance of criminal activity' by the arrestee based on the totality of the circumstances known to the officers at the time of arrest." *Vanegas*, 46 F.4th at 1164 (quoting *Lacey v. Maricopa Cnty.,* 693 F.3d 896, 918 (9th Cir. 2012) (en banc); *see also Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979) (explaining that "probable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, or is committing, or is about to commit an offense."). When considering probable cause, courts are required to consider the "totality of the circumstances," i.e. "the whole picture" rather than "each fact 'in isolation.'"[6] *Wesby*, 583 U.S. at 60–61. "This 'is not a high bar.'" *Vanegas*, 46 F.4th at 1164 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). Additionally, "[i]t is well established that 'if the facts support probable cause for one offense,' an arrest may be lawful 'even if the officer invoked, as the basis for the arrest, a different offense' which lacks probable cause." *Vanegas*, 46 F.4th at 1165; *see also Wesby*, 583 U.S. at 54 n.2 ("[A]n arrest is lawful if the officer had probable cause for any offense, not just the offense cited at the time of arrest or booking.").[7]

---

[6] The Court notes that certain state law requirements, like California Penal Code § 836(a)(1)'s requirement that "an officer may only make a warrantless arrest for a misdemeanor if he has probable cause to believe that the person committed the offense *in the officer's presence*," do not impact the probable cause analysis for a Fourth Amendment claim "because this requirement "is not grounded in the Fourth Amendment." *Vanegas*, 46 F.4th at 1165 (quoting *Barry v. Fowler*, 902 F.2d 770, 772 (9th Cir. 1990) (emphasis in original). However, this is not of consequence here because, as explained below, every officer had probable cause based on their own observations captured on BWCs.

[7] Given Plaintiff's only argument in opposition to Poole's Motion seeking qualified immunity on Plaintiff's Fourth Amendment false arrest claim was that Poole lacked probable cause because being arrested for expired registration does not involve the same conduct as resisting arrest or battery on a peace officer, Poole would be entitled to summary

As to the second requirement, if, based on clearly established law and the information possessed by officers, a "reasonable police officer could have believed that his or her conduct was lawful" Defendants are entitled to qualified immunity. *Vanegas*, 46 F.4th at 1166 (quoting *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1442–43 (9th Cir. 1991)); *see also Rivas-Villegas*, 595 U.S. at 5 ("A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'") (quoting *Mullenix*, 577 U.S. at 11). "In other words, qualified immunity still attaches when officers 'reasonably but mistakenly concluded that probable cause was present.'" *Vanegas*, 46 F.4th at 1166 (quoting *Wesby*, 583 U.S. at 63) (cleaned up) and citing *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1442–43 (9th Cir. 1991) ("Even absent probable cause, qualified immunity is available if a reasonable police officer could have believed that his or her conduct was lawful, in light of clearly established law and the information the searching officers possessed.")).

As an initial matter, the Court first notes that based on the BWC videos and other undisputed evidence summarized above, Poole and Ortiz's stop of Plaintiff was permissible and lawful under the Fourth Amendment. Even drawing all reasonable inferences in Plaintiff's favor and viewing the evidence in the light most favorable to Plaintiff, Poole and Ortiz were justified in stopping Plaintiff because the tags on his car were expired. *See United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc) ("Officers ... may conduct 'brief investigatory stops' without violating the Fourth Amendment 'if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot.'") (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Plaintiff's

---

judgment on that basis alone. The Supreme Court, in *Devenpeck v. Alford*, rejected that the probable cause inquiry was limited to facts that were closely related to the offense the officer relied on at the time of arrest. 543 U.S. 146, 152–54 (2004). Additionally, even if a connection between the basis for probable cause asserted had to be based on the same conduct that was stated as the basis for arrest, Plaintiff was not arrested for expired registration. He was permissibly stopped for expired registration.

suggestion that Ortiz and Poole saw and intentionally ignored the temporary certificate folded up and stuck to the top of the windshield on the opposite side of the car is pure speculation. To the extent its existence is evidence in support of this speculative proposition, it is no more than a scintilla of evidence and insufficient to raise a genuine issue of material fact regarding the propriety of the stop. There was no Fourth Amendment violation in stopping Plaintiff.

As summarized above, BWCs show: Plaintiff refusing to provide his driver's license and then indicating he did not have his driver's license; grabbing and pushing away Killinger's hand when he reached for Plaintiff at the open driver-side door; Plaintiff not taking his seatbelt off after being told repeatedly by multiple officers to take his seatbelt off; and Defendants' unsuccessfully attempting to get Plaintiff's hands behind his back as Plaintiff held his arms in front of his body while officers repeatedly told him to relax, warned that he would be put on the ground if he did not "cuff up," and telling him three times to put his hands behind his back and Plaintiff not doing so. The Court does not consider Plaintiff "body-checking" Killinger for purposes of analyzing qualified immunity because Plaintiff's version of this particular portion of this incident, i.e. that it did not happen, is not "blatantly contradicted by the record" such "that no reasonable jury could believe it." *Handy v. Jones*, — F.4th —, 2026 WL 2716416, at *5 (9th Cir. 2026) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") (applying and quoting *Scott*, 550 U.S. at 378–81). While the video suggests Plaintiff likely did push into Killinger in some way based on the movements of the officers on camera, the Court cannot reach that conclusion without weighing the evidence which is not permissible on summary judgment. *Anderson*, 477 U.S. at 255.

However, even without considering Plaintiff body-checking Killinger, Plaintiff's other conduct, captured on video, gave Defendants probable cause to arrest Plaintiff for a violation of California Penal Code § 148(a)(1) and Vehicle Code §§ 12500, 12951 (driving

without a valid driver's license). "California Penal Code § 148(a)(1) punishes '[e]very person who willfully resists, delays, or obstructs any public officer [or] peace officer, ... in the discharge or attempt to discharge any duty of his or her office or employment.'" *Vanegas*, 46 F.4th at 1165–66.

Plaintiff argues that Defendants could not have had probable cause based on a violation of § 148 because it requires that the officer who is resisted, delayed, or obstructed be acting lawfully and none of the officers were acting lawfully. First, as explained above, the stop was lawful and officers are permitted to order individuals out of a car at a traffic stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) ("We hold only that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."). Second, "[p]robable cause to arrest exists when there is a fair probability or substantial chance of criminal activity … based on the totality of the circumstances known to the officers at the time of arrest." *Vanegas*, 46 F.4th 1164; *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Probable cause is "a practical, nontechnical conception … a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003). Viewing the totality of the circumstances there was a fair probability that Plaintiff had violated § 148 by his conduct that was observed by the Defendants. *Wesby*, 583 U.S. at 60–61 (requiring courts consider the "totality of the circumstances," i.e. "the whole picture" rather than "each fact 'in isolation.'"); *see also Vanegas*, 46 F.4th at 1164 ("This 'is not a high bar.'") (quoting *Kaley*, 571 U.S. at 338).

Although it is not clear that every Defendant could be found to have actually arrested Plaintiff or that each Defendant is required to have their own independent observations sufficient for probable cause to arrest Plaintiff as Plaintiff argues, the BWCs reflect that

each Defendant with the exception of Sergeant Berg and Tutterow did have probable cause to arrest Plaintiff based on their own observations. Sergeant Berg's knowledge of Plaintiff's conduct had to be based on information provided by other officers because she arrived after Plaintiff was in handcuffs. However, as discussed below there was no violation by Sergeant Berg, Tutterow, or any other officer based on being an integral participant, failure to intervene or conspiracy theories of liability.

Poole[8] and Ortiz observed Plaintiff driving and Plaintiff's refusal to provide his driver's license. Poole, Ortiz, and Buell observed Plaintiff being told repeatedly to take his seatbelt off and not doing so as well as officers struggling to place Plaintiff in handcuffs. While Poole and Ortiz arrived at the car after Plaintiff opened the door they were both present as Plaintiff was being repeatedly ordered to take his seatbelt off, and while they left to go back to their car before Plaintiff was taken to the ground, they were still there through officers unsuccessfully attempting to place Plaintiff in handcuffs while he held his arms in front of his body. Buell observed the same conduct with Buell additionally observing Plaintiff's conduct through being taken to the ground. Wells, Valente, Fowler, and Killinger observed the above conduct at the open car door and additionally directly observed Plaintiff sitting back and scrolling on his phone after officers had repeatedly told him to take his seatbelt off. Fowler's BWC shows Plaintiff grabbing and pushing of Killinger's arm and Killinger experienced that conduct. Because each of these Defendants had probable cause there was not a Fourth Amendment violation based on false arrest.

Plaintiff has asserted his false arrest claim against some Defendants, including Sergeant Berg, based on a failure to intervene theory, and integral-participant theory, and

---

[8] The Court notes that Poole would be entitled to qualified immunity for an additional reason. In opposing Poole's Motion on Plaintiff's § 1983 false arrest claim, Plaintiff does not address any of the three statutes Poole identified as a basis for probable cause and did not identify any clearly established law to satisfy the second prong. Although the Court has considered and found that Poole had probable cause to arrest, this also provides a basis for qualified immunity.

a conspiracy theory. However, because there was no Fourth Amendment violation based on false arrest, Defendants cannot be liable under a conspiracy theory. "Conspiracy is not itself a constitutional tort under § 1983." *Lacey*, 693 F.3d at 935 (collecting cases). Conspiracy "does not enlarge the nature of the claims asserted by the plaintiff, as there *must always be an underlying constitutional violation*." *Id.* ("Conspiracy may, however, enlarge the pool of responsible defendants by demonstrating their causal connections *to the violation*.") (emphasis added). Similarly, there can be no violation for failing to intervene without a constitutional violation to intervene in. *Cunningham v. Gates*, 229 F.3d 1271, 1289–90 (9th Cir. 2000), *as amended* (Oct. 31, 2000) ("police officers have a duty to intercede when their fellow officers *violate the constitutional rights* of a suspect or other citizen," however, "officers can be held liable for failing to intercede only if they had an opportunity to intercede") (citing *United States v. Koon,* 34 F.3d 1416, 1447 n. 25 (9th Cir. 1994), *rev'd on other grounds,* 518 U.S. 81, 116 (1996) (additional citations omitted)). And as to the integral participant doctrine, it would not apply without "constitutionally defective conduct" for a Defendant to "know about and acquiesce[] in" or a "constitutional injury" the defendant set in motion. *Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022) (explaining that a defendant can only be an integral participant "if (1) the defendant *knew about and acquiesced in the constitutionally defective conduct* as part of a common plan with those whose conduct constituted the violation, or (2) the defendant set in motion a series of acts by others which the defendant knew or reasonably should have known would cause others to *inflict the constitutional injury*.") (emphasis added).

**(2) Was the Right Clearly Established**

Even if Defendants were mistaken about Plaintiff's conduct providing probable cause to arrest, they would all still be entitled to qualified immunity because Plaintiff has not shown "that the officers violated a clearly established right." *Vanegas*, 46 F.4th at 1166 (citing *Wesby*, 583 U.S. at 63; *see also Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) ("It is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established.") Because the right violated must be clearly

established, "qualified immunity still attaches when officers 'reasonably but mistakenly conclude[] that probable cause [i]s present.'" *Vanegas*, 46 F.4th at 1166 (quoting *Wesby*, 583 U.S. at 65). "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 1166 (quoting *Rivas-Villegas*, 595 U.S. at 5). "'Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Id.* (quoting *Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017)). Here, "[e]ven assuming the officers lacked actual probable cause to arrest [Plaintiff], the officers are entitled to qualified immunity because they 'reasonably but mistakenly concluded that probable cause was present,'" *Wesby*, 583 U.S. at 65, based on the conduct they observed and was recorded on numerous BWC videos.

All individual Defendants are **GRANTED** summary judgment on Plaintiff's Fourth Amendment false arrest claim based on qualified immunity.

**b) Excessive Force**

"Any claim that an officer used excessive force in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen is governed by the Fourth Amendment's standard of objective reasonableness." *Spencer v. Pew*, 117 F.4th 1130, 1137 (9th Cir. 2024) (quoting *Demarest v. City of Vallejo*, 44 F.4th 1209, 1225 (9th Cir. 2022) (applying *Graham*, 490 U.S. at 395–97). Defendants all move for summary judgment based on qualified immunity on Plaintiff's excessive force claim. As summarized above, these events occurred relatively quickly (*see supra* Section I), but Plaintiff's claims regarding excessive force can be generally categorized as: (1) removing Plaintiff from the car, including "slamming" him against the car; (2) taking him to the ground; (3) holding Plaintiff on the ground and handcuffing; and (4) the tightness of his handcuffs.[9]

---

[9] As explained further below, Plaintiff pursues failure to intervene and conspiracy theories as well.

As noted above, when assessing qualified immunity at summary judgment, the Court must determine whether, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" and "whether the right was clearly established in light of the specific context of the case." *Rice v. Morehouse*, 989 F.3d 1112, 1120–21 (9th Cir. 2021) (citations omitted). "Summary judgment is appropriate 'if the ... court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances.'" *Demarest*, 44 F.4th at 1225 (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). The Court considers both prongs of the qualified immunity analysis for each category of force.

In evaluating the first prong of qualified immunity, the Court considers "'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Rivas-Villegas*, 595 U.S. at 6 (quoting *Graham*, 490 U.S. at 396 and citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). Courts should also consider "all relevant circumstances, such as the following illustrative but non-exhaustive factors: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). [Courts] must judge the reasonableness of a particular use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Rice*, 989 F.3d at 1121 (quoting *Graham*, 490 U.S. at 396–97 and *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc)).

In evaluating the second prong of qualified immunity "[t]o be clearly established, 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* at 1125 (quoting *Anderson v.*

*Creighton*, 483 U.S. 635, 640 (1987)). "The Supreme Court has repeatedly cautioned [courts] 'not to define clearly established law at a high level of generality.'" *Id.* (quoting *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019)). "To determine whether [an officer] violated clearly established law, we look to cases relevant to the situation [the officer] confronted, mindful that there need not be a case directly on point." *Id.* (quoting *A.K.H. rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1013 (9th Cir. 2016)). "Existing precedent must place the lawfulness of the particular action beyond debate," for which "a body of relevant case law is usually necessary." *Id.* (quoting *Emmons*, 586 U.S. at 44). "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104–05 (2018) (internal citations and quotations omitted).

Before addressing each category, the Court notes the following, viewing the facts in the light most favorable to Plaintiff and drawing all inferences in his favor. The crime for which Plaintiff was initially and permissible stopped was expired registration tags, not a serious crime. Plaintiff's hands were moving in and out of sight as he spoke and gestured with his hands, particularly when Killinger stepped up next to the driver-side window.

**(1) Plaintiff's Removal from the Car**

As the summary above reflects (*see supra* Section I.B) by the time Plaintiff was being removed from the car, he had grabbed and pushed away Killinger's arm as he reached into the car toward Plaintiff. Viewing the facts in the light most favorable to Plaintiff the level of force Plaintiff employed to grab and shove away Killinger's arm was minimal, but force. Additionally, because the door was now open, Plaintiff's hands were more consistently visible, reducing the safety risk to officers. But, prior to Plaintiff's removal, numerous officers had already told him to take his seatbelt off and he started scrolling on his phone and only reached back towards the seatbelt release without actually releasing it as directed. While officers could have waited longer to remove him, given the initial force was simply pulling him out by his hands and holding him against the car, there was not

much more minimal force available. Even Killinger's reach inside to unbuckle the seatbelt resulted in minimal contact with Plaintiff. Given the minimal level of force used and the circumstances, officers' removal of Plaintiff from the car was reasonable.

Even if the minimal force used were not reasonable, Plaintiff has not identified a case or case law that would have put officers on notice that they could not remove him using this minimal level of force under similar circumstances. The Court discusses further below *Gravelet-Blondin*, 728 F.3d 1086, 1093 (9th Cir 2013) that Plaintiff relies on for the holding that "[t]he right to be free from the application of non-trivial force for engaging in passive resistance was clearly established prior to 2008." The case concerns the use of tasers, pepper spray, and beanbag projectiles as intermediate force. *Id.* Additionally, Plaintiff had not, at that moment, only engaged in passive resistance. He had grabbed and pushed away an officer's hand and arm. The Court cannot find existing precedent squarely governs the specific facts at issue" such that an officer would know this conduct was unlawful. *Kisela*, 584 U.S. at 104–05.

**(2) Defendants Taking Plaintiff to the Ground**

The officers moved from a very minimal level of force, pulling Plaintiff from the car and holding him against the car, to lifting him up and taking him to the ground. While they did not hit or kick him and Valente broke his landing, this level of force was not justified. It would have been objectively reasonable if Plaintiff did in fact body-check Killinger because that would constitute a greater level of active resistance than the minimal level exhibited here. While it is undisputed that Plaintiff was holding his arms in front of him, how much he was resisting is not apparent from the BWCs and without that incontrovertible evidence, there is a factual dispute regarding what exactly was happening when the officers increased the level of force quickly and significantly. At this stage, where the Court must view the facts in the light most favorable to Plaintiff, the Court cannot find the officers' take down of Plaintiff was reasonable in response to his minimal active resistance disclosed on video. Although the indisputable placement of Plaintiff's arms likely did pose some risk to officer safety because they had no idea what he might have in

his pockets, officers also had a hold of both his arms. Plaintiff was engaging in more than passive resistance given the prior grabbing and pushing away of Killinger, warning that he would be put on ground if he did not cuff up (and his response acknowledging the warning) and repeated warnings as officers obviously attempted to get his arms behind his back. However, the increase to taking Plaintiff to the ground so quickly was not reasonable given Plaintiff's active resistance was minimal.

The Court also finds that the unreasonableness of this increase in the level of force, disproportional to Plaintiff's level of resistance, was clearly established for purposes of qualified immunity. As with the finding itself, it would be different if Plaintiff's body-check of Killinger were not in dispute because the use of greater force would be warranted if dealing with a person demonstrating not just a lack compliance, but actively attacking an officer. These circumstances are in line with the guidance in *Gravelet-Blondin* that passive resistance cannot be met with non-trivial force. 728 F.3d at 1093. As noted above, the case explains that the use of non-trivial force is not permissible in response to passive resistance. *Id.* The Court was specifically addressing tasers and finding their use in dart mode was non-trivial. *Id.* at 1095–96. Additionally, Plaintiff relies on *Bryan v. MacPherson*, 630 F.3d 805, 828 (9th Cir. 2010) and its conclusion that a traffic violation will generally not support a significant level of force. While the factual circumstances of *Bryan* are somewhat different in that Plaintiff was at least minimally resisting, it does suggest that a disproportionate level of force is not reasonable when circumstances have moved only minimally from a traffic stop without significant active resistance.

The specific Defendants that took Plaintiff to the ground, Fowler, Wells, and Valente are not entitled to qualified immunity on Plaintiff's excessive force claim based on Plaintiff being taken to the ground.

**(3) Holding Plaintiff on the Ground and Handcuffing**

Once Plaintiff was on the ground, the BWCs show the use of minimal force. The officers around him are holding his arms so that his hands are behind his back for placing him in handcuffs for approximately twenty seconds with no officers on his back. There

are officers over his legs, but even assuming they were pressing on his legs to hold him in place, the force was minimal and extremely brief and he was quickly on his feet. The Court cannot find this level of force was unreasonable or that Plaintiff has identified any clearly established law that would have notified officers that holding his arms and legs in place for handcuffing was excessive. *See Reichle*, 566 U.S. at 664 ("In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'") (quoting *al-Kidd*, 563 U.S. at 741).

**(4) Tightening of Handcuffs**

"A series of Ninth Circuit cases has held that tight handcuffing can constitute excessive force. *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000) (citing *Palmer v. Sanderson,* 9 F.3d 1433 (9th Cir. 1993) and *Hansen v. Black,* 885 F.2d 642 (9th Cir. 1989); *see also Wall v. Cnty. of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004) ("It is well-established that overly tightening handcuffing can constitute excessive force.") "The issue of tight handcuffing is usually fact-specific and is likely to turn on the credibility of the witnesses." *LaLonde*, 204 F.3d at 960. As Defendants point out, there is certainly evidence here suggesting the Plaintiff's handcuffs were loosened. As explained above (*see supra* Section I.D) Plaintiff first complained of the overtightness when Poole checked them to ensure they were double locked. And in response Poole, Sergeant Berg, and Wells all adjusted them over approximately seven minutes. However, while the Court can see from the BWC videos that officers adjusted them, the Court cannot tell from the videos alone that they did not remain overtightened after adjustment. The Court cannot take Sergeant Berg's assessment that they were properly tightened at summary judgment when Plaintiff claims the contrary. "[I]t is difficult, if not impossible, to say that the only reasonable conclusion that the evidence permits is that the force used was reasonable; therefore this aspect of the case [must go] to the jury." *LaLonde*, 204 F.3d at 960 (addressing handcuffing) (citing *Lawson v. Umatilla Cnty.,* 139 F.3d 690, 692 (9th Cir. 1998)). Given the factual disputes and the case law regarding handcuffing, the Court finds that Poole, Berg, and Wells are not entitled to qualified immunity on Plaintiff's excessive

force claim based on overtightening of Plaintiff's handcuffs after he was placed under arrest.

All other Defendants are entitled to qualified immunity on Plaintiff's excessive force claim. There is no basis for finding any other Defendants were integral participants in or part of a conspiracy to take Plaintiff to the ground or overtighten his handcuffs. And there was no realistic opportunity to intervene in either. The take down took a matter of a few seconds for any Defendant to know about and the overtightening would have appeared resolved by what looks like three officers attempting to loosen the handcuffs. Any other Defendant would not have known the issue was not fixed, particularly given Plaintiff did not comment on the overtightening post-adjustments until he was in the car with only Poole in close proximity.

**c) Unlawful Search**

"Under a variety of conditions, law enforcement may execute a search without [a warrant], [f]or instance, police may execute warrantless searches incident to a lawful arrest: It is reasonable for authorities to search an arrestee for weapons that might threaten their safety, or for evidence which might be destroyed." *United States v. Kincade*, 379 F.3d 813, 822 (9th Cir. 2004) (citing *Chimel v. California*, 395 U.S. 752, 762–63 (1969)). "Vehicles are commonly impounded as part of law enforcement's 'community caretaking functions.'" *United States v. Anderson*, 101 F.4th 586, 591 (9th Cir. 2024) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976)) "The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Id.* (quoting *Opperman*, 428 U.S. at 369). "Inventory searches of impounded vehicles is a 'well-defined exception to the warrant requirement of the Fourth Amendment.'" *Id.* (quoting *Colorado v. Bertine*, 479 U.S. 367, 371 (1987)).

As discussed above, Defendants had probable cause to arrest Plaintiff and check his person incident to arrest. There was no Fourth Amendment violation in searching Plaintiff's person. Plaintiff argues that the Defendants conspired to conduct an investigative search of his car under the guise of an inventory search. As evidence of this

conspiracy, he points to the absence of a completed inventory form. However, there is no dispute that after Defendants ordered the tow of the car, arrangements were made for Plaintiff's fiancée to pick up the car. Defendants at the location discussed the car being picked up with individuals that were going to wait with the car and then Ortiz was contacted to clear cancelling the tow. Plaintiff also suggests that Ortiz clearing this, i.e. 1022ing it as long as they did not find anything means that they conspired to conduct an investigative search and the inventory was pretext. No reasonable jury could find an unreasonable search under these minimal and speculative facts, particularly when the rather cursory search for items of value to inventory is captured on officers' BWCs.

Plaintiff additionally asserts that Valente and Killinger obtained Plaintiff's phone and deleted the videos he took during his encounter with police. However, the BWC videos show Plaintiff's phone falling from his hand, bumped by Killinger, into the driver-side floorboard or between the seat and console. As Killinger reached into the car to unbuckled Plaintiff's seatbelt it fell. There is no evidence anyone touched his phone until Valente located it during the inventory search of the car captured on video. He went to Plaintiff who was in the police car, confirmed with Plaintiff that it was his phone and gave it to Sergeant Berg who gave it to Poole to add to Plaintiff's belongings. The only evidence that Plaintiff can point to is the absence of videos he claims to have taken, but that is not sufficient to create a triable issue of fact.

Defendants are entitled to summary judgment on Plaintiff's unreasonable search claim.

**d) Retaliation**

"The Supreme Court has held that retaliatory arrest cases generally 'present a tenuous connection between the defendant's alleged animus and the plaintiffs injury." *Hill v. City of Fountain Valley*, 70 F.4th 507, 518 (9th Cir. 2023) (quoting *Reichle*, 566 U.S. at 668) (explaining that "[t]he reason is that an officer may bear animus toward a plaintiff's protected speech, but that same speech is often a legitimate consideration for officers when deciding to make an arrest.") "Given this reality, the Court in *Nieves* held that the existence

of probable cause defeats a retaliatory arrest claim." *Id.* (citing *Nieves v. Bartlett*, 587 U.S. 391, 406 (2019)). The court provided "a narrow qualification … circumstances where officers have probable cause to make arrests but typically exercise their discretion not to do so." *Nieves*, 587 U.S. at 406–407 (identifying jaywalking as an example). The narrow exception to "the no-probable cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not." *Id.* at 407.

Plaintiff relies on comments made by Fowler and Berg after Plaintiff was arrested about his attitude and Tutterow writing in her report that Plaintiff said "fuck you" when BWC video shows he said "the fuck you shining your lights in my car." This is not objective evidence that Plaintiff "was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* Even assuming these stray comments rise to the level of demonstrating anything about Berg or Fowler's subjective views, "the statements and motivations of the particular arresting officer are 'irrelevant'" because the narrow exception when no probable cause is not required is an "objective inquiry." *Id.*

Defendants' motions for summary judgment are **GRANTED** on Plaintiff's retaliation claim.

**e) Section 1983 Fourteenth Amendment Equal Protection Claim (formerly § 1981 Claim)**

"In order to succeed on his equal protection claim, [Plaintiff] must prove that [Defendants] 'acted in a discriminatory manner and that the discrimination was intentional.'" *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948–49 (9th Cir. 2003) (quoting *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000) (finding the plaintiff failed to present evidence sufficient to raise a triable issue of fact on whether he was stopped for discriminatory reasons). "To avoid summary judgment, [Plaintiff] 'must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that [the Defendants' conduct] ... was racially motivated.'"

*Id.* (quoting *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 754 (9th Cir. 2001) and citing *Navarro v. Block*, 72 F.3d 712, 716 (9th Cir. 1995) (stating that "a long line of Supreme Court cases make clear that the Equal Protection Clause requires proof of discriminatory intent or motive")).

Here, Plaintiff argues the City's "RIPA-reported data reflect substantial racial disparities in discretionary enforcement during the same calendar year as Plaintiff's stop." (Doc. 229 at 23.[10]) The only other evidence Plaintiff points to as a basis for discriminatory intent or motive is Fowler and Berg's comments about "attitude," Berg's use of the word "lippy," and the other Defendants hearing those comments and not interrupting to correct them.

The RIPA statistics say nothing about discriminatory intent or motive of these individual Defendants and the Court cannot infer discriminatory intent or motive from these comments. Because the comments are unrelated to Plaintiff's race, they do not show these Defendants, Fowler and Berg, had any discriminatory intent. They certainly do not show other Defendants who simply heard them, assuming they did, had discriminatory intent. Because Plaintiff has failed to produce any evidence of discriminatory intent by the Defendants, Defendants are entitled to summary judgment on this claim. *Anderson*, 477 U.S. at 248 (explaining that at summary judgment, a nonmoving party "must set forth specific facts showing that there is a genuine issue for trial.")

**C. State Law Claims**

Defendants all move for summary judgment on all of Plaintiff's state law claims that are asserted against them. The City moves for summary judgment on all of Plaintiff's state law claims based on those claims failing as to the individual Defendants. Under California Government Code § 815.2 the City is vicariously liable for an injury caused by its employee and under § 815.2(b) where the employee is immune, the City is also immune.

---

[10] Plaintiff's oppositions as to the other Defendants cross reference this brief and section for this claim.

Accordingly, as noted below, the City is entitled to summary judgment on the claims that do not survive as to any Defendant, but they may proceed against the City on the claims that survive as to any Defendant.

**1. Battery**

"A state law battery claim is a counterpart to a federal claim of excessive use of force" because "[i]n both, a plaintiff must prove that the peace officer's use of force was unreasonable." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009) (citing *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1102 n.6 (2004)). "Claims that police officers used excessive force in the course of an arrest, investigatory stop or other 'seizure' of a free citizen are analyzed under the reasonableness standard of the Fourth Amendment to the United States Constitution." *Id.* ("The question then is whether a peace officer's actions were objectively reasonable based on the facts and circumstances confronting the peace officer.").

Accordingly, Plaintiff's battery claim may proceed only to the same extent as his excessive force claim, limited to the take down and the overtightening of his handcuffs—as to the take down as to Fowler, Wells, and Valente and the overtightening of handcuffs as to Poole, Sergeant Berg, and Wells (*see supra* Section II.B.1.b)—and as to the City based on the claim surviving as to individual Defendants. Defendants are otherwise entitled to summary judgment on this claim.

**2. False Imprisonment**

Each Defendant has moved for summary judgment on the claim. Plaintiff has also filed a motion for partial summary judgment in his favor on this claim.

"The elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Easton v. Sutter Coast Hosp.*, 80 Cal. App. 4th 485, 496 (2000). When an officer has probable cause, a plaintiff "fails to establish an essential element of false imprisonment under California law—that he was arrested 'without lawful privilege." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1170 (9th Cir. 2011). In *Young*,

the court found officers had probable cause to arrest a plaintiff for violation of § 148(a)(1) for refusing to obey an officer's directive during a traffic stop. *Id.* at 1159 n.3. Because the Court has found Defendants had probable cause (*see supra* Section II.B.1.a)(1)) Plaintiff cannot meet the without lawful privilege element for this claim. Plaintiff alleges his false imprisonment claim against Poole is based in part on lacking reasonable suspicion to stop him. As the Court already addressed (*see supra* Section II.B.1.a)(1)), based on the BWC videos and other undisputed evidence summarized above (*see supra* Section I.A), Poole and Ortiz's stop of Plaintiff was permissible and lawful under the Fourth Amendment. Even drawing all reasonable inferences in Plaintiff's favor and viewing the evidence in the light most favorable to Plaintiff, Poole and Ortiz were justified in stopping Plaintiff because the tags on his car were expired notwithstanding the temporary certificate no one was aware of until after Plaintiff was arrested. *See United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc) ("Officers ... may conduct 'brief investigatory stops' without violating the Fourth Amendment 'if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot.'") (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

Defendants are entitled to summary judgment on this claim and Plaintiff is not.

**3. Intentional Infliction of Emotional Distress**

"The elements of the tort of intentional infliction of emotional distress are: '(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856, 874 (2010) *as modified on denial of reh'g* (Mar. 1, 2010). "Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.'" *Id.* at 875 (quoting *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991)). "It is not enough that the conduct be intentional and outrageous." *Id.*

Defendants argue Plaintiff cannot succeed on this claim because Defendants did not engage in any extreme or outrageous conduct, i.e., the force used against Plaintiff was reasonable and not excessive. Defendants assert that they either did not use any force against Plaintiff for those who were not involved with any force against Plaintiff or that the force used was reasonable. Plaintiff relies on the premise that removing him from the car, taking him to the ground, and arresting him without probable cause is all extreme and outrageous conduct sufficient to proceed with this claim.

Based on the analysis above addressing Defendants' use of excessive force against Plaintiff (*see supra* Section II.B.1.b)), there is a triable issue of fact for this claim, but only as to the take down as to Fowler, Wells, and Valente, the overtightening of handcuffs as to Poole, Sergeant Berg, and Wells, and as to the City based on the claim surviving as to individual Defendants.

**4. Trespass to Chattels**

"Trespass to chattel, although seldom employed as a tort theory in California …, lies where an intentional interference with the possession of personal property has proximately caused injury." *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1566 (1996). "The defendant's interference must, to be actionable, have caused some injury to the chattel or to the plaintiff's rights in it." *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1350–51, (2003).

In moving for summary judgment on this claim, Defendants assert that Plaintiff has no evidence that Defendants scratched his car or otherwise damaged any of his personal property. Plaintiff's only response is that his laptop was damaged, his vehicle scratched, and his personal property disturbed. Plaintiff's briefing on this claim does not identify any evidence in support other than Plaintiff's own declaration to that effect. Because this is not sufficient to raise a triable issue of fact on this claim, Defendants are entitled to summary judgment.

**5. Negligence**

Under California law, the elements of a negligence claim are (1) "defendant had a duty to use care," (2) defendant "breached that duty," and (3) the breach of that duty "was

the proximate or legal cause of the resulting injury." *Hayes v. Ctny. of San Diego*, 57 Cal. 4th 622, 627 (2013)).

In opposing Defendants' motions for summary judgment on this claim, Plaintiff argues California's tort law reasonable care standard is not coextensive with the Fourth Amendment's reasonableness standard. Plaintiff also argues Defendants acted unreasonably resulting in Plaintiff being imprisoned when he should have just received a ticket. These cursory statements without any explanation what acts by each Defendant were breaches of a duty of care for negligence is insufficient to survive summary judgment based on acts that were negligent, but not in violation of the Fourth Amendment. However, because California's negligence law "is broader than federal Fourth Amendment law" rather than narrower, *Alves v. County of Riverside*, 135 F.4th 1161, 1172 (9th Cir. 2025), the Court finds Plaintiff's negligence claim can proceed, but only as to the take down as to Fowler, Wells, and Valente, the overtightening of handcuffs as to Poole, Sergeant Berg, and Wells, and as to the City based on the claim surviving as to individual Defendants.

**6. Bane Act**

"The elements of a Bane Act claim are essentially identical to the elements of a § 1983 claim, with the added requirement that the government official had a 'specific intent to violate' a constitutional right." *Chinaryan v. City of Los Angeles*, 113 F.4th 888, 907 (9th Cir. 2024) (quoting *Hughes v. Rodriguez*, 31 F.4th 1211, 1224 (9th Cir. 2022)). "An officer acts with the requisite specific intent if 'the right at issue [is] clearly delineated and plainly applicable under the circumstances of the case,' and the officer 'commit[s] the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that right.'" *Sandoval v. County of Sonoma*, 912 F.3d 509, 520 (9th Cir. 2018) (cleaned up) (quoting *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 225 (2017)). "The officer need not 'recognize the unlawfulness of his act' if he 'acted in reckless disregard of the constitutional right.'" *Id.* (quoting *Cornell*, 17 Cal. App. at 386)).

Here, the only constitutional violation at issue is excessive force, based on the take down of Plaintiff and overtightening his handcuffs. Given that the Court has found there is a triable issue of fact as to the unreasonableness of this use of force, the Court heeds the Ninth Circuit's guidance, that "the existence of specific intent for a Bane Act claim is a question that is 'properly reserved for the trier of fact.'" *Chinaryan*, 113 F.4th at 907 (quoting *Hughes*, 31 F.4th at 1224). Although the officers' comments in *Chinaryan* were more indicative of acting with reckless disregard, the Court also noted that "[t]he officer's refusal to exercise discretion to use less intrusive measures when warranted would support a finding that they acted with reckless disregard for plaintiff's rights." *Id.* at 908. As discussed above, one of the problems with Defendants' take down of Plaintiff was the quickness they resorted to that level of force for someone engaging in active, but minimal resistance. Plaintiff's Bane Act claim may proceed as to the take down as to Fowler, Wells, and Valente, the overtightening of handcuffs as to Poole, Sergeant Berg, and Wells, and as to the City based on the claim surviving as to individual Defendants.

**7. Ralph Act**

Under the Ralph Act, all people under California's jurisdiction have the right to be free from "violence . . . [or] intimidation . . . because of . . . any characteristic . . . in subdivision (b) or (e)[.]" Cal. Civ. Code. § 51.7(b)(1). Race and color are protected characteristics pursuant to section (b). *Id.* To state a Ralph Act claim, a plaintiff must show: "(1) the defendant committed or threatened violent acts against the plaintiff; (2) the violence or intimidation was motivated by their perception of a protected characteristic; (3) the plaintiff suffered an injury; and (4) the defendant's conduct was a substantial factor in causing the plaintiff's harm." *Piccini v. City of San Diego*, Case No. 21-cv-01343-W-KSC, 2022 WL 2788753, at *4 (S.D. Cal. July 14, 2022) (citation omitted); *see also Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 880–81 (2007).

As discussed above in addressing Plaintiff's § 1983 claim based on violation of equal protection (*see supra* Section II.B.1.e), Plaintiff has not provided evidence from which a jury could find any Defendant committed or threatened violent acts against

Plaintiff motivated by his race. Defendants are entitled to summary judgment on Plaintiff's Ralph Act claim.

**8. Punitive Damages**

"Punitive damages may be awarded in a § 1983 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Est. of Nunis by & through Nunis v. City of Chula Vista*, 676 F. Supp. 3d 867, 886, (S.D. Cal. 2023) (quoting *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (citation omitted). Given Plaintiff's excessive force claim is proceeding based on Defendants' take down of Plaintiff and overtightening of his handcuffs, Plaintiff may proceed on punitive damages, but only as to the take down as to Fowler, Wells, and Valente and the overtightening of handcuffs as to Poole, Sergeant Berg, and Wells.

**D. *Monell* Claim Against the City of San Diego**

Municipalities cannot be held vicariously liable under 42 U.S.C. § 1983 for the actions of their employees. *Monell v Dep't of Soc. Servs.*, 436 U.S. 658, 691 (2018). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694. To prevail in a civil action against a local governmental entity, the plaintiff must establish "(1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389–91 (1989)).

A plaintiff may establish municipal liability under § 1983 in one of three ways. "First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity."

*Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992) (internal quotation marks omitted) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). Second, the plaintiff may establish that a governmental official with "final policy-making authority" ratified a subordinate's unconstitutional conduct. *Id*. at 1346–47 (citations omitted). Finally, a municipality may be held liable for inadequate training of its employees, but only where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390.

Plaintiff pursues his *Monell* claim under the first path, arguing that: (1) an unofficial policy of racially disparate enforcement in violation of Equal Protection was a moving force behind violation of his Equal Protection rights; (2) an unofficial booking policy that designates an officer other than the one allegedly assaulted to effectuate the arrest resulted in Plaintiff being booked overnight; and (3) the City's use-of-force policy is inconsistent with Ninth Circuit law. (Doc. 228 at 18–22.) The first and second policies cannot survive because a "municipal defendant[] cannot be held liable [when] no constitutional violation occurred," *Henrich*, 39 F.3d at 916 (9th Cir. 1994), and Plaintiff has failed to establish constitutional violations based on false arrest (*see supra* Section II.B.1.a)) or Equal Protection (*see supra* II.B.1.e).

The claim also cannot succeed on Plaintiff's newly added theory based on the City's use-of-force policy. Although Plaintiff has raised a triable issue of fact regarding excessive force as to two uses of force (*see supra* Section II.B.1.b), Plaintiff has not set forth any evidence that this policy was a moving force for those violations. First, the policy itself is based on the totality of the circumstances, including more than twenty factors with the matrix Plaintiff relies on being only a guide. (Doc. 239 at 10.) In this respect, it would be hard to find the policy was the moving force behind the constitutional violation. Second, as the City explains, even if it were sufficiently specific that it could have directed the Defendants' conduct in this situation, Plaintiff has not presented any evidence that any of the Defendants that took down Plaintiff or handcuffed him did so based on this policy.

Even drawing all reasonable inferences in Plaintiff's favor, the Court cannot find this policy was a moving force behind Defendants' excessive force. The City is entitled to summary judgment on Plaintiff's *Monell* claim.

## III. CONCLUSION

Based on the foregoing the Court rules as follows:

- Poole's Motion for Summary Judgment (Doc. 205) is **GRANTED in part and DENIED in part**. Poole's Motion is **DENIED** on the excessive force claim, battery claim, intentional infliction of emotional distress, negligence, Bane Act claim, and punitive damages based only on overtightening of Plaintiff's handcuffs. The Motion is otherwise **GRANTED**.
- Sergeant Berg's Motion for Summary Judgment (Doc. 206) is **GRANTED in part and DENIED in part**. Sergeant Berg's Motion is **DENIED** on the excessive force claim, battery claim, intentional infliction of emotional distress, negligence, Bane Act claim, and punitive damages based only on overtightening of Plaintiff's handcuffs. The Motion is otherwise **GRANTED**.
- The City of San Diego's Motion for Summary Judgment (Doc. 207) is **GRANTED in part and DENIED in part**. The City's Motion is **DENIED** on the battery claim, intentional infliction of emotional distress claim, negligence claim, and Bane Act claim based on vicarious liability for the Defendants conduct for the take down and overtightening of Plaintiff's handcuffs. The Motion is otherwise **GRANTED**.
- Fowler's Motion for Summary Judgment (Doc. 208) is **GRANTED in part and DENIED in part**. Fowler's Motion is **DENIED** on the excessive force claim, battery claim, intentional infliction of emotional distress claim, negligence claim, Bane Act claim, and punitive damages based only on the take down of Plaintiff. The Motion is otherwise **GRANTED**.
- Killinger's Motion for Summary Judgment (Doc. 209) is **GRANTED**.
- Ortiz's Motion for Summary Judgment (Doc. 210) is **GRANTED**.

- Valente's Motion for Summary Judgment (Doc. 211) is **GRANTED in part and DENIED in part**. Valente's Motion is **DENIED** on the excessive force claim, battery claim, intentional infliction of emotional distress claim, negligence claim, Bane Act claim, and punitive damages based only on the take down of Plaintiff. The Motion is otherwise **GRANTED**.
- Wells' Motion for Summary Judgment (Doc. 212) is **GRANTED in part and DENIED in part**. Wells' Motion is **DENIED** on the excessive force claim, battery claim, intentional infliction of emotional distress claim, negligence claim, Bane Act claim and punitive damages based only on the take down of Plaintiff and overtightening of Plaintiff's handcuffs.
- Plaintiff's Partial Motion for Summary Judgment (Doc. 214) is **DENIED**.
- Tutterow's Motion for Summary Judgment (Doc. 215) is **GRANTED**.
- Buell's Motion for Summary Judgment (Doc. 218) is **GRANTED**.

The parties shall meet and confer before **October 15, 2026** and file a Joint Status Report by **October 22, 2026** with a proposed date for a final pretrial conference and new pretrial deadlines.

**IT IS SO ORDERED.**

Dated: September 28, 2026

HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE